## NEASHAM v. NEW YORK LIFE INS. CO.

### (District Court, D. Nevada. July 16, 1917.)

### No. 1967.

1. INSURANCE ⬥665(6)—WEIGHT AND SUFFICIENCY OF EVIDENCE—CAUSE OF DEATH.
   In an action on a life insurance policy defended on the ground that insured committed suicide, verdict for plaintiff *held* supported by the evidence.

2. INSURANCE ⬥646(7)—PRESUMPTIONS—CAUSE OF DEATH.
   Primarily the presumption is against self-destruction, and it is one of the strongest presumptions with which courts have to deal, and, while it will not prevail against clear and definite proof, suicide will never be inferred if the circumstances are consistent with any other reasonable theory.

3. INSURANCE ⬥646(6)—PRESUMPTIONS—CAUSE OF DEATH.
   There is a presumption against murder or the intentional taking of the life of another as well as against suicide, and if the evidence be such as to warrant the inference either of suicide, murder, or accident, in an action on an insurance policy, the presumption must always be in favor of accident.

4. INSURANCE ⬥668(12)—QUESTIONS FOR JURY—CAUSE OF DEATH.
   If the circumstances surrounding the death of an insured person are consistent with either murder or suicide, the question must be left to the jury to determine as between the two conflicting causes.

5. INSURANCE ⬥665(6)—QUESTIONS FOR JURY—CAUSE OF DEATH.
   The absence of motive by an insured person for committing suicide, while not conclusive, is a consideration which enters strongly into the sum of the evidence in determining the cause of death.

At Law. Action by Matilda C. Neasham against the New York Life Insurance Company. On petition for a new trial. New trial denied.

Thomas E. Kepner, of Reno, Nev., for plaintiff.

Cheney, Downer, Price & Hawkins, of Reno, Nev., for defendant.

VAN FLEET, District Judge. This is a petition for new trial. The action is by the widow of William C. Neasham, deceased, to recover on a life policy issued by defendant to her husband in which she is named as beneficiary. The policy, for $10,000, was issued July 10, 1914. It contains a stipulation avoiding it in the event of self-destruction of the assured, sane or insane, during the first insurance year. Deceased met a violent death February 27, 1915, and the defense was that he died as the result of a self-inflicted gunshot wound—a suicide. The jury found the issue against defendant, and awarded plaintiff a verdict, upon which judgment was entered; and defendant now asks that the judgment be vacated and the verdict set aside.

A number of grounds are advanced in support of the petition, the one principally pressed being insufficiency of the evidence to sustain the verdict, and as the others, involving alleged errors in law, were maturely considered at the trial, this is the only question which now calls for consideration.

At the close of the evidence the defendant moved the court for an instructed verdict, which was denied, and this ruling is insisted upon by defendant as involving error. But recognizing the well-defined distinction in the principles applicable to a motion for an instructed verdict and those which obtain upon an application for a new trial, it is contended by defendant that, assuming the evidence to be such as to justify the court in denying the former motion, there is nevertheless such an entire lack of any real, substantial controversy on the question as to the cause of the death of the assured, and that the evidence preponderates so strongly in support of the defense, that it is now the imperative duty of the court to grant the present application and set the verdict aside.

This necessitates a brief consideration of the features of the evidence bearing on the cause of death, all of which was circumstantial.

On the morning of his death the deceased, who resided with his family in Reno, was observed between 8:30 and 9 o'clock walking through town and out along the track of the Southern Pacific Company toward Sparks, and about an hour later was found in a moribund condition, lying in a cut or depression by the side of the track some distance east of Reno. He was apparently unconscious when found, but was still breathing in a heavy or stertorous manner. The coroner and sheriff reached the scene some time after 10 o'clock, and on their arrival found him dead. The place where the body lay was locally referred to as the "gravel pit" or "oil pit," a deep sunken way or cut along the railroad track between Reno and Sparks, with a wagon road running through it to facilitate loading and hauling oil from an oil pipe or tank situated on the railroad right of way. The body was lying on its right side, with the right arm partly extended at an angle from the body, and the left lying across the abdomen. A pistol—a Savage automatic of .32 caliber—which the evidence tended to identify as one purchased by the deceased the day before, was lying some few inches from the right hand, and an empty cartridge shell of .32 caliber was found on the ground near the body. The head was lying up the slope of the cut, with the feet extending into or near the wagon track. The clothing was not in disorder, except that the hat had fallen off, and there was no evidence at the point where the body lay of any disturbance of the ground to indicate a struggle. The deceased's watch, a small sum in coin, and some other small articles were found on his person. Blood was oozing from the mouth and nostrils, and a fresh bloodstain was found on the right arm of the coat at the elbow. Investigation disclosed a wound in the back part of the throat or mouth, a little to the right of the median line, leading through the soft palate and into the brain cavity, of a size sufficiently large to enable the insertion of the middle finger of a man's hand, and so located as not to be visible except by opening the mouth and depressing the tongue. Fractured bone could be felt in the wound, and a stellar-shaped fracture of the skull was found on the back part of the head just above and to the right of the occipital protuberance, with a small fraction of skull bone pushed out beyond the regular contour of the skull, but no exit wound through the scalp; the fracture being on a line

a little upwards from the point of entrance of the wound in the throat. While the autopsy was not such as to definitely disclose the producing cause of the wound, the opinion of the sheriff and doctors was that the wound was from a gunshot. There was no apparent injury to the lips, teeth, or tongue, and the testimony of the physicians was to the effect that the wound could not, in their opinion, have been caused, other than by the insertion of the weapon in the mouth, without injuring the adjacent organs, unless inflicted while the deceased had his mouth open in the act of yawning or retching, or crying out in agony, and that it was of a character to produce death.

These are, in substance, the facts relied on by defendant as making in favor of the theory of suicide, and, standing alone, they are perhaps more than ordinarily persuasive of the correctness of that theory. But they do not stand alone. Arrayed against them, or at least with them, are certain additional circumstances disclosed by the evidence, which, in an effort to establish suicide purely from circumstances, must be taken into account.

In the first place, the evidence is wholly lacking in anything in deceased's situation tending to disclose motive for taking his own life. He was in what may be termed fairly easy financial circumstances. He was a rancher and stockman, owning a large ranch, with stock and other personal property, and having his home in Reno. His ranch was under mortgage for $15,000, but the loan was not due for nearly a year and a half, and the evidence tended without controversy to show that his ranch was worth at least twice the amount of the mortgage, while he had to his credit in the bank at the time of his death a balance of something over $800, and nothing was shown to indicate that he was at the time to any extent disturbed over business affairs. He was between 47 and 48 years of age, a large, strong, robust man, in good health, and of uniformly cheerful disposition; lived very happily with his wife and family, consisting of a number of children—"an ideal family life," as testified by the minister of his church,—attended church frequently, and a fraternal organization of which he was a member. The evidence disclosed that he had returned only two days before his death from a visit with his wife and other members of his family to the opening of the Panama-Pacific Exposition in San Francisco, where he had enjoyed himself, and appeared very cheerful and happy throughout the trip. He had been in his bank the day before his death, and the president testified that he appeared perfectly normal in manner; while on the morning of his death he was up and about the house as usual with his family, dressed the baby, helped his wife in the kitchen, and was in his usual cheerful mood at the breakfast table; and a friend who met and talked with him for several minutes on the street, when he was on his way to the scene of his death, testified that he had never appeared more cheerful and contented. It appeared, moreover, that he did not seek or apply for the insurance involved, it having been taken out at the solicitation of an agent of the defendant; and there is no suggestion that at the time the policy was issued, or at any other time, the idea of self-destruction was even remotely entertained. So much on the question of motive.

The body of the deceased was first discovered by one Lalonde, a sheep shearer temporarily stopping at the time in Sparks. He testified, in substance, that he was walking on the railroad track, and saw deceased lying in the cut and heard him breathing heavily; that, thinking there was something wrong, he called to two other men whom he saw in the vicinity, and they all went down to where deceased was lying, or within a few feet of where he lay, saw the pistol near the body, and, concluding that he had shot himself, went to a nearby point and telephoned to the sheriff, and when they returned to the place where the body lay life was extinct. These three men, Lalonde, Brown, and Rodolph, afterwards testified at the inquest as to the fact of finding the body, but they had disappeared before the trial, and could not be found or produced, and their testimony as taken before the coroner was read by consent. No definite effort, so far as appears, was made at the inquest to identify these men as to their permanent place of abode, their character, antecedents, or mode of life, nor as to how they came to be in the vicinity at the time. They testified that they were out walking and just happened to meet there. One of them testified that they heard no report of a gun.

The evidence tended to show that the ground where the body lay was sandy and damp, and of a character to clearly show the impression of footprints, and there were certain footprints testified to by the officers as having been found about the body. They differed somewhat, however, as to the results of their observations in this regard. The coroner testified that "the only tracks were the footprints of one person that led to where the body lay"; that he saw no others. The sheriff testified: "Arriving at the scene, I found three tracks leading down to where the body was lying; one track leading to the spot, and two other tracks leading to within eight or ten feet of the spot. Those tracks turned and went back, making altogether five lines of tracks, three going and two returning. * * * I saw no tracks other than what I have mentioned." The undertaker, who accompanied the officers, stated: "I observed a few tracks coming from the east toward the body. I didn't take much interest in that; I was interested in other matters." No effort was made to identify the tracks or footprints testified to as leading up to the body as those of the deceased, nor was it clearly shown whether those particular tracks stopped at the point where the body lay or were retraced. Moreover, the inquiry as to the character of the soil and evidence of tracks was directed generally to "the ground where the body lay," and the fact was not developed whether the condition of the wagon road running through the cut was such that footprints of one walking in the roadway could be readily discerned or followed.

Ex-Sheriff Burke, superintendent of state police at the time of the death, an experienced officer, testified to making an examination of the place where the body was found and its immediate surroundings, on Sunday, the day after the death, for any indications of other persons having been in the vicinity; and he stated that at a point about 100 to 125 feet from where the body lay, just across the railroad track, he found tracks in the soft, sandy ground, "and observed a place where some one had been lying down."

There was a discrepancy in the evidence as to the condition of the pistol found by the body of the deceased and the number of unexploded shells it then contained. The shopkeeper who sold the weapon to deceased testified that when deceased bought the pistol he asked him how it worked and to load it; that he informed him that he had but nine cartridges on hand, while the weapon carried more, but deceased said that would be enough, and they were inserted in the magazine before he took the weapon away. There was produced in evidence at the trial the pistol with eight unexploded cartridges and one empty shell, and the sheriff testified, in substance, that when he picked the weapon up from the ground the hammer was back—that is, the gun in a position to shoot by pulling the trigger—with a shell in the chamber, the others in the magazine, and one empty shell lying on the ground; that he removed the magazine and the shell from the chamber, picked up the shell on the ground, and turned them over, with the weapon, to the coroner, from whose custody they were produced. It was developed on his cross-examination that his testimony at the inquest, as reported in the certified transcript of the proceedings, differed from this in one or two significant respects. It there appeared that, when he was there being examined about the condition and contents of the pistol when picked up, these questions were put and answered:

"Q. Is this in the same condition that it was? A. No; I removed the shell from the chamber, and there are nine shells in the magazine. Q. Is it in the same condition? A. It is in the same condition with the exception that the safety was on the trigger; I took the shell out of the chamber, and there are nine in the magazine."

And it was shown in this connection that with the "safety on the trigger" the hammer could not be drawn back or cocked or the weapon exploded; that in that condition the weapon was harmless.

As suggested, the autopsy was not carried to a point sufficient to disclose the character of the missile making the wound, if missile it was. The surgeon conducting it, as indicated from his evidence, assuming apparently that the wound was the result of a gunshot and was sufficient to cause death, made no further or more definite examination as to the producing cause of the wound in the throat. The scalp was turned down sufficiently to disclose the nature of the fracture of the skull, but the brain cavity was not opened, nor, so far as appears, was a probe used to search for a bullet, the operator contenting himself with inserting his finger in the opening in the throat. Accordingly the evidence did not disclose whether there was a bullet in the brain, or, if there was, that it was of the same caliber as the empty shell found by the body. Moreover, there was apparently no effort made to ascertain whether the pistol, when picked up, bore any evidence of having recently been discharged, such as burnt powder or otherwise.

One other circumstance remains to be noticed to which much significance is attached by the plaintiff. When the body of the deceased was brought home from the coroner's, there was observed by members of the family on the forehead, over the right eye, just at the line of the hair, and partly covered by it, evidence of an injury various-

ly referred to by the witnesses as "a dent," "a depression," or "a scar," which the evidence tended to show had never before been observed by the members of deceased's immediate family or others acquainted with him, including his family physician, who had attended the family for 11 years. It was described by the different witnesses as being all the way from an inch and a quarter to two or more inches in length, and three-sixteenths to a quarter of an inch deep—of sufficient depth and length, as one or two expressed it, to partly lay the little finger in it—but with little, if any, discoloration. It was first observed by the undertaker at his undertaking rooms, who said he thought it a scar and paid no particular attention to it, but he testified that it was not caused by moving the body or handling it after death. The family physician characterized it as a bruise or scar, apparently made with a blunt instrument, which it had taken considerable force to produce—sufficient to knock a man down and perhaps render him unconscious—but as to how recently it had been inflicted, he stated it was impossible definitely to say, for the reason that such a wound, if inflicted when death shortly ensues, does not take on the same appearance or characteristics as under other circumstances; that the blood, being stopped in its circulation, has not the same tendency to extravasate or cause discoloration, as on a living person, and particularly in an injury to the scalp, where the capillaries are not profuse. There was no evidence tending more definitely to disclose when or how this injury was inflicted upon the deceased.

[1] These are, in their material substance, the circumstances bearing upon the manner in which the deceased came to his death. Can it be justly said that, when considered as a whole, they point so inevitably and certainly to the conclusion of self-destruction that the jury, as reasonable men, were not justified in adopting a contrary view: and that their finding is so lacking in substantial support in the evidence that it is now the duty of the court to set it aside? With a full appreciation of the responsibility, so strongly impressed by counsel as resting upon the court, to supervise their verdict, and see, so far as lies within the proper exercise of its power, that it speaks the truth, I feel constrained to answer the inquiry in the negative.

Before discussing the facts, it will be well to have in mind the principles which must control in their consideration.

[2] Primarily, the presumption is against self-destruction, and it is one of the strongest presumptions with which courts have to deal. Being, as it is, entirely opposed to natural instinct to deliberately take one's own life, the fact will never be inferred unless the evidence is such as to fairly exclude every other reasonable hypothesis as to the cause of death. Of course, the presumption will not prevail against clear and definite proof; but if the circumstances are consistent with any other reasonable theory, the latter must be adopted to the exclusion of that of suicide. These principles have become axiomatic in their application. Elliott on Evidence, §§ 2393-2394. The rule is thus stated by that learned author in the last section:

"No general or definite rule can be stated as to the extent or degree of proof considered sufficient to establish the theory of suicide. It is evident that it must be sufficient to overcome the presumption against the voluntary taking

of one's own life. And if the circumstances proved to establish the theory of suicide leave a reasonable hypothesis that death resulted in any other manner, the evidence will be regarded as insufficient. A general rule might be formulated to the effect that the preponderance required of the insurer in order to overcome the proof and presumptions against suicide must be such as to exclude with reasonable certainty any hypothesis of death by accident or by the act of another."

And as illustrating the strength of the presumption the author states in section 2392:

"The presumption of law is always against suicide. This presumption is so strong that the courts usually require some evidence of an intention of suicide, as the intent is regarded as the gist of the act. This presumption against suicide is also strong enough to rebut the usual and natural inferences that might arise from the conditions and circumstances ordinarily pointing to suicide. Thus where the assured was found dead, lying on his back with a pistol in his right hand, which was lying across his breast, and there was a pistol or gunshot wound in his right temple, this was held insufficient evidence of suicide."

As graphically stated by the Supreme Court of Kentucky in the leading case of Ætna Life Insurance Co. v. Milward, 118 Ky. 716, 82 S. W. 364, 68 L. R. A. 285, 4 Ann. Cas. 1092, discussing the reasons underlying the presumption:

"The love of life is instinctive; self-preservation is its first, as it is its strongest, law. In the absence of mental derangement, of any known fact calculated to unseat the judgment and to overcome the love of life, the inquiring mind naturally and properly looks for other causes of the deed when death by violence occurs. When all the facts are inconsistent with the theory of suicide, except simply that of the dead body in the presence of its instrument, it would be unnatural and illogical to confine the inquiry to that incident, and declare the death suicide. The act of suicide is not only unnatural, but is highly immoral and criminal. The presumption of law is against it; so is the presumption of fact."

[3, 4] It is true that the presumption is likewise against murder or the intentional taking of the life of another. Accordingly, if the evidence be such as to warrant the inference either of suicide, murder, or accident, the presumption must always be in favor of the latter (Starr v. Insurance Co., 41 Wash. 199, 83 Pac. 113, 4 L. R. A. [N. S.] 636); whereas, if the circumstances exclude the theory of accident, but are consonant with either murder or suicide, the question must be left to the jury to determine as between those two conflicting causes. Ætna Life Ins. Co. v. Milward, supra.

Examining the circumstances with these principles in view, I think it will readily be seen that the case is not one where the court would either have been warranted in granting an instructed verdict or be justified in setting at naught the finding of the jury.

The three facts most strongly dwelt upon by defendant in support of the theory of suicide are, naturally, the character of the death wound, the purchase of the pistol by deceased so immediately preceding death, and the finding of the weapon in close proximity to the body. As indicated above, these circumstances, picked out of the whole body of the facts and isolated from their associated surroundings, undoubtedly tend to lead the mind, as matter of first impression, to the inference of self-destruction; but it will be found that when

considered in the light of precedent they are not even, taken by themselves, to be regarded as of a significance so unerring as to necessarily negative the theory of death occurring in some other manner. Many cases may be cited based upon circumstances of very similar import, and pointing to suicide with a degree of apparent certainty substantially as strong, and in some aspects perhaps even stronger, where the courts have refused to hold that the jury were not justified in finding against the theory of self-destruction.

Thus, in Ætna Life Insurance Co. v. Milward, supra, the following facts, as stated by the court, were presented, which, it will be observed, present a case as strikingly significant of suicide in many of its features as the present:

"The insured was found dead from the effects of a pistol shot wound in the head. His body, partially disrobed, as he had slept, was discovered lying in a small porch or entry, which was partially inclosed, at the rear of his residence. By his side were two pistols, both loaded, but in one a discharged cartridge. The shot entered his head on the left side, behind the ear, and passed through in nearly a straight line. The two pistols were lying rather to his right side. He was right-handed. His domestic relations were apparently pleasant, being happily married. He had also two young children. His health was good. His mercantile business was prospering satisfactorily. He was about 34 years old, and a man of good habits and character. The shot which killed him was fired about dawn November 21, 1900. It was heard by but one person, who testifies in the record. The tragedy was unseen by any witness in the case. Appellee, widow of deceased, and her two infants slept in an upstairs room, but were not aroused by the shot. There were no other evidences of violence, nor of the presence of another person at the scene of the killing. The backyard, where it occurred, had walks leading to it which were paved, and would not for that reason have shown tracks. One of the pistols probably belonged to deceased, or had recently been in his possession. It was a nickle-plated Iver-Johnson revolver. The other, a blued-steel barrel pistol, was not identified as to its ownership. It was from the latter the fatal shot was fired. There was some evidence that the insured was a man of intense application to business, was of a nervous temperament, that he had a year or so previous to his death consulted a physician, who had advised him to take a rest on account of nervous exhaustion or depression, and that he took a vacation of two or three weeks in the Northwest. After his return the physician found him restored to health, and quit treating him. A few days before his death deceased complained of pain in the back of his head."

## Discussing these facts, the court say:

"Appellant argues that the verdict is flagrantly against the evidence, because, it is contended the evidence, of which the foregoing is a fair epitome, shows clearly that the death was suicide; or, in any other view of it, * * * fails to show that the death was caused by accidental means, and therefore there was a failure of proof on behalf of the plaintiff. As indicated, the evidence is wholly circumstantial. It may none the less point as unerringly to a correct conclusion as if detailed by eye-witnesses. * * * Circumstantial evidence tells the story of a past transaction by the similitude between the things shown to have been done and what, in the experience of mankind, has been found to be generally the cause or result of similar occurrences. From these the mind deduces the most probable cause of the occurrence in question. The result of this process of reasoning has been found to be so unvarying as to justify its adoption as a rule of evidence. The jury were authorized to apply to the facts detailed their knowledge of human nature, and to indulge, in aid of deduction predicated upon the established facts, those presumptions which common experience has established, and which therefore the law allows."

And it was held that, viewing the evidence in the light of these presumptions, the jury were justified in reaching the conclusion that the death occurred from a cause other than suicide, and that it could not be said that in this process of reasoning the jury were required to "guess" the cause of death.

In Kornig v. Western Life, etc., Co., 102 Minn. 31, 112 N. W. 1039, the facts were, in substance, these:

The deceased was a man of cheerful disposition, living happily with his family, a kind father, and devoted to his children. He had been moderately successful in business, and immediately before his death was in possession of a considerable sum of money, amounting to several thousands of dollars. There was testimony to the effect that he had slept and lived at home, and got his meals at home, where he had all his things, including his clothing; that his wife had seen him on the day of his death and daily for some time before; but it further appeared that from the 1st day of March up to the 12th day of April, the day of his death, he had had a room rented in a house in Minneapolis. There was evidence tending to show that on the day of his death he had had trouble with the woman of the house where he had the room, and that he had shot her; that she ran into the street for assistance, and that thereupon the officers entered the premises and found deceased dead upon the floor.

As stated by the court:

"He was lying on his left side, with his left cheek on the floor, his left arm beneath the body, the legs bent at the knees and drawn up, and the right arm so that the hand was on his leg. Loosely gripped in his hand was the revolver, the muzzle of which projected between and below the legs, so that it was visible to one standing in the doorway. In the right side of the head was a bullet wound, about an inch and a half back of the ear. The trend of the bullet was downward and backward. Two or three cartridges remained in the revolver, which was of a .38 or a .32 caliber. Two or three empty cartridge shells had been extracted from it. Only a small amount of money and some papers were found on the person of the dead man. No one was found in the building in any wise connected with the death of the insured."

Upon these facts it was said by the court:

"The defendant insists that the testimony demonstrates that this was a case of suicide, pure and simple. The law on this subject is well-settled. There is little controversy as to its formula and a singular unanimity in its application. * * * It is the defendant who must, when circumstantial evidence is relied upon, establish such facts as preclude the hypothesis of natural, violent, or accidental death. The burden of proof does not rest on the plaintiff to establish such facts as demonstrate or justify the theory of death otherwise than by the hand of the insured himself, in order that the jury may find against death by suicide. It is not material that 'there was not enough evidence to say that murder was done.' O'Rear, J., in Ætna Life Ins. Co. v. Millward, 118 Ky. 716, 82 S. W. 364, 365 (and see cases collected at page 366), 68 L. R. A. 285 [4 Ann. Cas. 1092]. Moreover, where the cause of death is in doubt, there is a presumption of law against death by suicide. It is true that there is a corresponding presumption against death by crime. The result of the rule in such a case as this is, as has been well said by Cassoday, C. J., in Rohloff v. Aid Association, 130 Wis. 61, 109 N. W. 989, 991: 'Can it be said as a matter of law that the inferences or conclusions to be drawn from such facts are so clear and unambiguous that reasonable men, unaffected by bias or prejudice, would agree that the deceased intentionally shot himself?'"

And it was held that the jury were justified in finding that the case was not one of suicide.

In Fidelity & Casualty Co. v. Love, 111 Fed. 773, 49 C. C. A. 602, the facts are sufficiently indicated in the discussion of their effect by Judge Selby, writing the opinion for the Court of Appeals, sustaining the judgment for the plaintiff, where he says:

"Whether Noah committed suicide or not was a question of fact. He was found dead on his bed, only partly dressed, with his feet on the floor, with a pistol loosely grasped in his hand. There was some evidence as to the range of the ball that passed through his head, which tended, or at least was offered, to show that he did not fire the fatal shot. But if it be conceded, as the weight of the evidence seemed to show, almost, if not quite, conclusively, that the deceased held the pistol that fired the shot, it is not absolutely certain that he committed suicide. No one saw the shooting. Whether it was accidental or intentional is a matter of surmise. There is evidence tending to show that he was despondent and probably tired of life, and evidence tending to the contrary. There is conflict even as to the wound and its location. The evidence is not entirely inconsistent with the theory of accidental killing. * * * The evidence is presented in detail and at length in the record, and it would serve no useful purpose to state it. In a case very much like this one in many of its features, the Supreme Court has recently held that the trial court did not err in submitting the question of suicide to the jury. Supreme Lodge v. Beck, 181 U. S. 49 [21 Sup. Ct. 532, 45 L. Ed. 741]."

There are other interesting cases that might be referred to, but it would subserve no useful purpose to discuss them. In all of them the facts were strongly, but unsuccessfully, urged by the insurer as practically demonstrating suicide. See, also, National Union v. Fitzpatrick, 133 Fed. 694, 66 C. C. A. 524; O'Connor v. Modern Woodmen, etc., 110 Minn. 18, 124 N. W. 454, 25 L. R. A. (N. S.) 1244; Metropolitan Life v. De Vault, 109 Va. 392, 63 S. E. 982, 17 Ann. Cas. 27.

Illuminated by the reasoning of these cases, the sinister significance of the facts relied on as making in favor of suicide is greatly modified, if not largely negatived; and when they are considered, as they must be, with all the concomitant circumstances, it is impossible, with a just appreciation of the reasonable deductions to be drawn therefrom, to say that the jury were not warranted in the conclusion reached by them. The one respect in which the instant case can in an essential respect be differentiated from the facts presented in any one of those above cited is in the peculiar character and location of the injury causing death. But, in the first place, it would be going far to say that such a wound, even if definitely shown to have been produced by deceased's pistol, could not have been the result of accident—from a careless handling or examination of the weapon—especially in view of the fact, which the evidence tends to disclose, that the deceased was unfamiliar with its working. But conceding that that theory is not sufficiently probable as the basis of a verdict, to make it reasonable, very clearly the facts do not exclude the theory of the injury having been received at the hands of another. It may readily be conceived that it could have been inflicted in a close, deadly struggle with an assailant, or after deceased had been knocked down—the weapon being inserted in his mouth to stifle his cries for help or to deaden the sound of the explosion. And to account for the absence of any indications of a struggle where the body lay, and the condition of the clothing, it might well be that the assault was committed on the railroad

track or at some other point where evidence of a struggle would not be left, and the body carried to the cut and there disposed as found for the very purpose of indicating suicide. The jury may well have reasoned in this way, and it would not, as contended, involve a resort to surmise or speculation, but merely legitimate deduction from the circumstances. Ætna Life Ins. Co. v. Milward, supra.

So far as the purchase of the pistol is concerned, it is not of controlling significance. It may have been dictated from any one of many considerations in no wise connected with the purpose by deceased to take his own life. He may have been aware that he was going on a dangerous errand and might need it for protection. And as to the finding of the weapon by the body, that is a feature characterizing so many cases of death by violence as to carry necessarily little weight. As said by the court in Kornig v. Western Life, etc., Co., supra, in discussing the circumstances of a revolver found loosely gripped in the right hand of the deceased:

"In the nature of things, this circumstance is by no means conclusive. Nothing is more common in the history of crime than to place the means of death near or in the hands of the victim. The revolver was not shown to have belonged to the deceased, nor to have been formerly in his possession. In many reported cases in which the insurance companies have sought to avoid liability on the theory of suicide, the presence of a pistol, in connection with other circumstances, has been held by the courts not to sustain the defense. The fact that a pistol was found in the hand of deceased is not conclusive. In Leman v. Manhattan Life Ins. Co., 46 La. Ann. 1189, 15 South. 388, 24 L. R. A. 589, 49 Am. St. Rep. 348, a man without physical or mental disturbance or financial or family trouble and in good spirits was found dead with a pistol wedged in the bed of his thumb. The verdict for the beneficiary was sustained. In Travelers' Ins. Co. v. Nitterhouse, 11 Ind. App. 155, 38 N. E. 1110, the beneficiary recovered, although the deceased was found with a bullet hole near the center of his forehead, and with a self-cocking revolver in his right hand; the last three fingers resting on the handle, the index finger on the trigger, and the thumb just back of the hammer. In very many other cases beneficiaries recovered notwithstanding the presence of the revolver in the immediate vicinity of the deceased."

Another circumstance should not be overlooked. The pistol found lying by the deceased was a modern high-power weapon, carrying, as the evidence discloses, steel-jacketed cartridges of great penetrating force, and yet, as we have seen, the projectile fired into deceased's brain, if such was the cause of the wound, made no exit. There are other considerations of a minor character arising upon the evidence, tending, in a greater or less degree, to negative the theory of suicide; such, for instance, as to how, as the body lay, blood could have gotten on the elbow of his coat. They need not be all here adverted to, since it is not now so material how, in fact, the deceased came to his death, as it is that the evidence be shown to involve some reasonable theory of death other than self-destruction; and it would seem that what has been suggested, when taken in conjunction with the very potent although negative circumstance that there is an entire absence of anything in the evidence tending to disclose motive, establishes such a case.

[5] The absence of motive, as in a crime, while in no wise conclusive, is, notwithstanding, a consideration which enters strongly into the

sum of the evidence to be considered, in an effort to establish suicide from circumstances.

Thus, in Modern Woodmen v. Kozak, 63 Neb. 146, 88 N. W. 248, discussing the absence of motive, it is said:

"But there is another fact of which the jury could not have been ignorant, namely, the absence from the record of all evidence tending to show a motive inciting to self-destruction. Self-murder is abhorrent to the mind, and common observation teaches that normal men are not driven to the desperation of suicide without some exciting cause of more than ordinary magnitude."

And see note to Modern Woodmen, etc., v. Kincheloe, 175 Ind. 563, 94 N. E. 228, 28 Ann. Cas. 1913C, 1259, 1262.

As a result, and after a more than usually painstaking consideration of the record in this case, I am satisfied that there was that in the circumstances presented to the jury to fully warrant the verdict rendered; and that to set their verdict aside would, in effect, be to deny the plaintiff her constitutional right to have the jury pass upon the facts.

This conclusion renders it unnecessary to consider the plaintiff's motion to dismiss the petition for want of due service.

A new trial will be denied.