NATIONAL UNION v. FITZPATRICK.

(Circuit Court of Appeals, Fifth Circuit. January 3, 1905.)

No. 1,396.

1. INSURANCE—SUICIDE—BENEFIT  CERTIFICATE — ACTIONS—EVIDENCE—HARM-LESS ERROR.

Where defendant contested liability on a benefit certificate on the ground that insured committed suicide, and claimed that his motive was a certain defalcation discovered against him, it was not reversible error for the court to permit insured's father-in-law to answer whether, with his property and credit, witness could have borrowed the sum specified.

2. SAME—BURDEN OF PROOF.

Where a benefit society resisted payment of a certificate because insured was alleged to have committed suicide, within an exception in a certificate, the burden was on it to establish such fact.

3. QUESTIONS FOR JURY.

In an action on a benefit certificate, whether insured committed suicide, within an exception in the certificate, was for the jury.

In Error to the Circuit Court of the United States for the Middle District of Alabama.

This was an action by Eleanor Fitzpatrick against the National Union on a policy or benefit certificate for $5,000 issued on January 25, 1900, on the life of her husband, David Fitzpatrick, in which she, as his wife, was named beneficiary. The defense was based upon a provision in the application for a policy or benefit certificate to the effect that no benefit should be paid if the applicant should, within two years after becoming a beneficial member, commit suicide. The issue thus made was submitted to a jury, which returned a verdict in favor of the plaintiff. Judgment was entered on the verdict, and the National Union brings this writ of error.

David Fitzpatrick, the assured, was found dead in one of the rooms of the Commerical & Industrial Association, a social organization in the city of Montgomery, between 5 and 6 o'clock in the afternoon of December 3, 1900. The deceased, Fitzpatrick, went into the rooms of the Commercial & Industrial Association between 11 and 1 o'clock—probably near noon. Soon after going to the rooms of the association, he appears to have gone into what was called the "committee room"—a small room used for committee meetings—in which there was a telephone. The first thing Fitzpatrick did after going into the room was to use the telephone. After this he was seen by an employé of the association, several times, sitting in a chair, with his feet in another chair, apparently asleep. Between 5 and 6 o'clock, Vickers, the employé who had frequently seen deceased sitting in that position during the afternoon, informed Gilbert, the secretary of the association, that Fitzpatrick had been in that attitude a long time; and thereupon Gilbert opened the door of the committee room, which was closed, but unlocked, and found that Fitzpatrick was dead. The hands of the deceased were lying in his lap. They were not folded, but in his right hand was a pistol. There was an overcoat over his lap. There was a wound in the left breast of the deceased. He had apparently been dead several hours.

A number of witnesses testified that, on Sunday before the Monday of Fitzpatrick's death, they saw him at the home of his father-in-law; that he was in good spirits, and was cheerful and jovial. He was at home all day. One witness testified that he was with Fitzpatrick and his wife for an hour, and that they were telling jokes; that witness would tell one, and Fitzpatrick would tell one; and that there was nothing unusual in his conduct.

¶ 1. Suicide as a defense to a life insurance policy, see notes to Ætna Life Ins. Co. v. Florida, 16 C. C. A. 623; Fidelity & Casualty Co. v. Egbert, 28 C. C. A. 284.

On the morning of the day of his death, Fitzpatrick was at home, assisting the girls in framing some pictures, and had a glass cutter to cut the glass for the pictures, which was too small. When he left home he said he had an engagement with Mr. Safford, and that when he returned he would bring a larger glass cutter with him. Before starting down town he played with the children about the house, and with the dog, and also fed a kitten on the back porch. Mrs. Vass, his mother-in-law, heard him laughing with her younger daughter. Before leaving home, he said he would send a box in which to pack some bric-a-brac which was to be packed in the box, and it came to the house about 1:30 or 2 p. m.

A. A. Walker testified that Fitzpatrick, on the morning of his death, came to see him about a policy which had lapsed in the Penn Mutual; that Fitzpatrick was evidently laboring under some great excitement, but that he was not intoxicated; that he went to witness' office twice that morning. Witness' best recollection was that, on the second visit, deceased stated to him, in substance, that it was too late now. Witness was not positive that he used the expression, "No; never mind now; it is too late," but his best recollection is that he did.

Fitzpatrick had been for several years in the employ of the Standard Oil Company as chief clerk and cashier in the City of Montgomery, Ala., in which capacity he handled between two and three thousand dollars a day. He was under bond to the Standard Oil Company, his surety being the Fidelity & Deposit Company of Baltimore. On the 31st day of July, 1900, deceased had resigned his position with the Standard Oil Company. Some two or three months before the death of Fitzpatrick, he was informed by one A. J. Mapes, local manager for the Standard Oil Company in Montgomery, that he was short with the company; that he (Mapes) was very much surprised at it; and Fitzpatrick was asked what he was going to do about it, and, in reply, Fitzpatrick said that he would see that it was properly fixed up, and the money returned. Mapes did nothing more towards the collection of this alleged shortage, and it was not paid. Some two or three weeks before Fitzpatrick's death, William A. Safford, who was agent of the Fidelity & Deposit Company in Montgomery, received a letter from the surety company containing a statement of the shortage which had been made by the Standard Oil Company against Fitzpatrick and the surety company. This letter instructed Safford to call upon Fitzpatrick, and ask him to make good the amount shown in the statement to be short. Safford wrote a note to Fitzpatrick, and afterward had a conversation with him. Fitzpatrick came to the office of Safford on Thursday or Friday preceding the Monday on which he died. When he came into the office, Safford turned over to him for inspection the letter and statement from the surety company. The instructions were rather peremptory, and Fitzpatrick, after reading the letter from the company, and looking over the various items in the statement, told Safford that he would endeavor to make the amount good, and would come in the next day, or the second day thereafter, and see Safford about it, if he would grant him that time. Safford then granted him the time. On Saturday preceding the Monday on which Fitzpatrick died, he went back to the office of Safford, and stated that he had made an effort to raise the money to reimburse the Standard Oil Company, but had failed to get it. Safford says that Fitzpatrick then looked very despondent, and said he did not know what to do. He asked Safford if he thought the surety company would permit him to go to Kentucky to see his brother, with a view of raising the money there. Safford said he did not know, but he believed the disposition of the company would be to give him all the time necessary. Fitzpatrick then remarked that he did not know whether this would avail him anything or not, but he would think the matter over, and see Safford again on the succeeding Monday at 12 o'clock. Safford in this interview asked Fitzpatrick if he had said anything to Mr. Vass, his father-in-law, about his trouble. Fitzpatrick replied that he had not, and first declined to do so, but, before leaving the office, said he believed he would see Mr. Vass about the trouble the next day—Sunday. In one of the conversations Fitzpatrick had with Safford, he was informed by the latter that he would be compelled to carry out the instructions of the surety company given in the letter, which

was to arrest him, unless the shortage was made good within a reasonable time. In the conversation on Saturday, Fitzpatrick said he had endeavored to borrow the money from his brothers, but had not been able to get it from them. He also stated that he was very hard pressed for money. Safford told Fitzpatrick that he thought the company would wait on him; that he knew they would be willing to do that, and also to let him go to see his brothers in Kentucky. Fitzpatrick said nothing to Vass on Sunday about his trouble. Safford had a conversation with Vass (Fitzpatrick's father-in-law) on Monday, and probably after the death of Fitzpatrick, about deceased's shortage, and Vass told him he was very much surprised to hear it; that he had never heard anything of the kind; and told Mr. Safford most assuredly, there would be no difficulty in settling the matter.

There was some conflicting evidence as to the habits of the deceased with reference to the use of intoxicants, but it is clear that there was sufficient evidence to justify the jury in finding that his habits in this respect were not bad, or sufficiently so, at least, to be of material importance in the case.

Counsel for plaintiff in error in their brief say: "There was testimony pro and con upon the question of Fitzpatrick's use of intoxicants. As the jury might have found upon the testimony that Fitzpatrick did not use intoxicants excessively, the truth of this fact is assumed for the purpose of this argument, and the consideration of the testimony on this point is for this reason omitted."

The above is substantially the evidence in the case. The court was requested to instruct the jury to return a verdict for the defendant, but declined to do so. The correctness of this action of the court in refusing to direct a verdict for the defendant makes the main issue here. There is an assignment of error relied on by counsel for plaintiff as to a question asked by the court of its own motion of the witness D. N. Vass with reference to his financial condition. This last alleged error, and that of the refusal of the court to direct a verdict for defendant (although there are other assignments of error), are the only two matters insisted upon by counsel in their brief filed in this court.

Robert E. Steiner, Horace Stringfellow, and Charles J. Kavanagh, for plaintiff in error.

Crum & Weil and J. M. Chilton, for defendant in error.

Before PARDEE and SHELBY, Circuit Judges, and NEWMAN, District Judge.

NEWMAN, District Judge, after stating the facts as above, delivered the opinion of the court.

Conceding that the question asked by the court of T. N. Vass, the father-in-law of the deceased, whether, "with the property and credit you had, could you have borrowed $259.62," and the answer elicited, were irrelevant, and that the question should not have been asked, nor the answer permitted, it could not really have any material effect on the minds of the jury one way or the other. There can be little, if any, doubt, under the evidence, of Vass' ability to have assisted Fitzpatrick in arranging satisfactorily the comparatively small amount of shortage to the Standard Oil Company, and especially in view of the apparent lenient disposition of the representative of the surety company. The only matter upon which any stress might be laid is as to Fitzpatrick's apparent unwillingness to call upon his father-in-law for assistance. In this view of the matter, the admission of Vass' answer as to his ability to raise $259.62, even if error, could not have sufficiently influenced the verdict for it to be regarded as reversible error here.

The main question here is whether, under the evidence in this case, it was the duty of the court to have directed a verdict in favor of the defendant. Did the evidence require such a verdict and no other, or was the case such that the court was justified in submitting it to the jury for determination?

There is no error in the charge of the court, or in its action on the requests to charge. The case, on the law, was submitted fully and fairly to the jury.

The plaintiff having shown the death of Fitzpatrick, and the defendant claiming that the cause of death was one excepted from the operation of the policy or benefit certificate, it was incumbent on it to show, to the reasonable satisfaction of the jury, this fact. Home Benefit Association v. Sargent, 142 U. S. 691, 12 Sup. Ct. 332, 35 L. Ed. 1160; Union Mutual Life Ins. Co. v. Payne, 105 Fed. 172, 45 C. C. A. 193; Fidelity & Casualty Co. v. Love, 111 Fed. 773, 49 C. C. A. 602.

The jury was instructed by the presiding judge to this effect; that is, that the burden was on the defendant to show that the cause of death came within the exception of the policy as claimed. The duty of the trial judge in a case like this was before this court in the case last named (Fidelity & Casualty Co. v. Love), and in that case Circuit Judge Shelby, speaking for the court, says:

"Whether Noah committed suicide or not was a question of fact. He was found dead on his bed, only partly dressed, with his feet on the floor, with a pistol loosely grasped in his hand. There was some evidence as to the range of the ball that passed through his head, which tended, or at least was offered, to show that he did not fire the fatal shot. But if it be conceded, as the weight of the evidence seemed to show almost, if not quite, conclusively, that the deceased held the pistol that fired the shot, it is not absolutely certain that he committed suicide. No one saw the shooting. Whether it was accidental or intentional is a matter of surmise. There is evidence tending to show that he was despondent and probably tired of life, and evidence tending to the contrary. There is conflict even as to the wound and its location. The evidence is not entirely inconsistent with the theory of accidental killing. The evidence is presented in detail and at length in the record, and it would serve no useful purpose to state it. In a case very much like this one in many of its features, the Supreme Court has recently held that the trial court did not err in submitting the question of suicide to the jury." Supreme Lodge v. Beck, 181 U. S. 49, 21 Sup. Ct. 532, 45 L. Ed. 741.

In the case of Supreme Lodge v. Beck, suicide was the defense; and Mr. Justice Brewer, in the opinion, discussing the alleged error of refusal to direct a verdict, and after stating the facts in that case, uses this expression: "Under these circumstances, it is impossible to say that, beyond dispute, he committed suicide." And it was then determined that there was no error in the trial court's refusal to direct a verdict, and submitting to the jury the question of whether Beck committed suicide. Under the evidence in this case "it is impossible to say that, beyond dispute" Fitzpatrick committed suicide. If it were necessary to do so, much could be cited from the evidence in favor of the fact that Fitzpatrick did not intentionally kill himself. He was a young man, apparently in good health, happily married. His relations with his wife and with her family—they all living together—appear to have been ex-

cellent. Even if he had ever used intoxicants to excess, he certainly did not do so at the time of his death—at least, not to such an extent as to justify despondency. His shortage to the Standard Oil Company is not shown to be a criminal one, and the amount was not such, in view of the attitude of the agent of the surety company in the matter, as to make him at all hopeless about arranging it. However this may be, and in any view of the facts, they were not such, in our opinion, as to require the court to direct a verdict in favor of the defendant.

The presiding judge saw the witnesses on the stand, heard the evidence delivered, and refused to direct a verdict; considering it a matter for the jury to determine. The jury, having a like opportunity to see and hear the witnesses, found a verdict for the plaintiff. Under these circumstances, we would not be justified in interfering with the conclusion reached.

The judgment of the Circuit Court is affirmed.