**OSSAM v. MOSS, Supervisor of Permits, et al.**

No. 5139.

District Court, E. D. New York.
Nov. 25, 1930.

Lewis Landes, of New York City, for plaintiff.

Howard W. Ameli, U. S. Atty., of New York City (Herbert H. Kellogg and Geo. H. Bragdon, Asst. U. S. Attys., both of Brooklyn, N. Y., and John E. O'Neill, Legal Adviser, Treasury Department, of New York City, of counsel), for defendants.

BYERS, District Judge.

This is an action in equity to review the revocation of the plaintiff's permit to use denatured alcohol in the manufacture of sundry items of perfume, toilet water, and the like.

Diversion was alleged of the denatured alcohol during the period embraced between December 10, 1928, and February 25, 1930. In that interval, the sole product of the plaintiff was called by him "Supreme" ("Perfume Supreme") and was composed of denatured,

alcohol and lilac oil, in the proportions of 126 ounces of the former to 2 ounces of the latter.

The lilac oil was introduced into the barrels of denatured alcohol by the permittee; the mixture was "agitated" and filled into one-gallon cans (which the permittee says were labeled with the word "Supreme" and his trade-name "La Salle Mfg. Co., Brooklyn, N. Y.,") ten of which filled a case. The product is said to have been marketed in that guise.

The grounds of revocation are four in number:

The first charges diversion, in that, between December 10 and December 31, 1928, 3,000 gallons of specially denatured alcohol were withdrawn, but not sufficient essential oil was then possessed for conversion, and false records were fabricated to show manufacture of "Supreme."

The second charges diversion between (a) December 10, 1928, and July 1, 1929, and (b) December 1, 1929, and February 25, 1930, of 47,000 gallons of specially denatured alcohol withdrawn under the permit; the essential oils required for conversion into "Supreme" not being possessed by the permittee; false records having been submitted to cover the discrepancy, and false sales records having been kept to conceal the diversion.

The third charge is that false sales records were kept between July 1, 1929, and December 1, 1929, to cover and conceal the diversion which occurred during that time.

The fourth charge is that the 1930 permit of the plaintiff was issued by reason of his application, filed in August, 1929, which contained the false assertion that the permittee was qualified by law to have the privilege applied for.

In reviewing that which was submitted to the hearer in substantiation of these allegations, it is necessary to allude briefly to the nature of the permittee's activities and his methods.

The manufacturing has been described. The marketing was effected, during the entire period in question, by the reputed sale of "Supreme" to two customers: Frey & Horgan Corporation, 25 Beaver Street, New York City, brokers and commission merchants of vegetable oils, tallow, and grease; and Murray Oil Products Co., Inc., 29 Broadway, New York City, business not disclosed in the testimony.

These purchasers did not take actual delivery, which uniformly was made to Waterfront Service Corporation, operating a warehouse at the foot of Nineteenth street, Brooklyn, and receipts were issued to the purchasers. Delivery from the warehouse was made to the customers of these two concerns, through transfer of the receipts.

There is nothing to show to whom the Murray Company made sales, but the transactions, or many of them, conducted by Frey & Horgan are revealed in the record. The latter sold "Supreme" to Tunley & Co., Inc., of 12 Water street, New York City, also engaged in the tallow, oil, and grease business, and the dealings of the latter are embodied in an affidavit, verified April 17, 1930, by A. H. Aubertin, who describes himself as president of the company.

Introduction of that document in evidence was objected to upon familiar grounds, and because identity of the items and formulæ was not disclosed. The latter basis of objection disappears from a reading of the affidavit, but its relevancy and competency seem to require attention.

Having in mind that the hearer was engaged in the discharge of an administrative function, the purpose of which was to disclose good faith or lack of it, on the part of the permittee, and not the trial of a lawsuit, the test seems to be whether any requirement of fairness to the permittee was violated by the acceptance of the affidavit. The primary duty of the administrator, acting through his agents, is to prevent violations of the law. The effect of his decision is not to punish an offender, or to deprive him of his liberty or property; it is simply to withdraw a privilege of which the permittee is found to be unworthy.

The authorities which seem to sanction the receipt of this affidavit are the following: Yudelson v. Andrews (C. C. A.) 25 F.(2d) 80, at page 83, and U. S. ex rel. Smith v. Curran (C. C. A.) 12 F.(2d) 636, 637.

In reversing a Federal Trade Commission order, Judge Hough, writing for the Circuit Court of Appeals in this circuit (Bene & Sons v. Fed. Trade Commission, 299 F. 468, at page 471) said: "The questions suggested by the foregoing references are whether the Commission, in its investigations, is restricted to the taking of legally competent and relevant testimony. We incline to think it is not by the statute, and, having regard to the exigencies of administrative law, that it should not be so restricted."

A like rule would seem to be appropriate in hearings such as that under examination,

the regulations concerning which permit the introduction of appropriate affidavits.

The affidavit discloses that the customers of Tunley & Co. gave false and fictitious names and addresses, and paid for their purchases in cash.

This course of dealing was not directly brought home to the permittee, but, if he was engaged in distributing into legitimate consumption a "Supreme Perfume," he seems to have displayed a singular reluctance to learn anything concerning the ultimate destination of his product.

He made deliveries to the warehouse through a public truckman, whom he once described as "my truckman," by the name of Campanello.

The cases of "Supreme" were removed from the warehouse by a trucking concern named "Banter" and Walsh. Banter has never been found, and is said to be non-existent. But two of the trucks, the numbers of which were shown on the warehouse delivery records, were owned by Campanello, and the license records in evidence so disclose.

Some of the deliveries from the warehouse were taken by Walsh, who told Inspector Kania that, in so doing, he acted under instructions of La Salle Mfg. Company, according to the inspector's testimony.

The permittee filed an affidavit by Walsh, contradicting this statement flatly.

In view of the other testimony of Kania, which was well authenticated, it cannot be questioned that the hearer was at liberty to accept Kania's version of Walsh's statement, if he was so persuaded.

It must be remembered that the diversion attributed to the permittee was of the denatured alcohol, and was said to have been concealed through failure to procure the amount of essential (lilac) oil, which was required to convert into "Supreme."

The permittee did not procure his oil from a conventional distributor whose establishment and methods bore the indicia of good faith.

His dealings with one Morganstern, doing business as Felix Pharmacal Co., 16 John street, New York City, challenge attention. The bills and checks passing between the permittee and this source of supply are in evidence, and would not be discredited except for this circumstance: Morganstern stated to the inspector that he is not engaged in the oil business (he is president of the Medicone Company, suppository manu-

facturer, at the same address), but purchased these oils from other sources, and delivered them personally, in a taxicab, to the permittee; as to the alleged purchase of 4,825 pounds of lilac oil between January 1, 1929, and February 10, 1930, he bought the oil from one Pierre, whose address and telephone number he did not know, and he did not know how he could be located. Taxicab deliveries, from 16 John street, New York City, to the permittee's place of business in Brooklyn, of over two tons of oil, would be sufficient to challenge the credulity of a less emotional person than the prohibition administrator.

The permittee filed an affidavit of Morganstern, reciting in detail the items he says he sold and "actually delivered" to the permittee; the affidavit is carefully silent with reference to Mr. Pierre.

The statement made to the inspector concerning the fugitive Pierre is, of course, hearsay, but the hearer cannot have overlooked Mr. Morganstern's failure to appear and testify, or the permittee's failure to request an adjournment in order to enable Morganstern to present himself in person.

One more aspect of the permittee's methods should be stated:

He withdrew not less than 66,000 gallons of specially denatured alcohol during the fourteen-month period in question, and says that he converted all of this into "Supreme," which would require above that number of cans. A shortage was established of over 19,000. The permittee says that this is accounted for by the return of used cans, but he is unable to demonstrate anything on that subject.

There is no record of a credit account with his customers, nor of a purchase account of second-hand cans, nor can he identify the delivery agency. Tunley & Co., the purchaser from Frey & Horgan, depose that no empty cans were returned by their customers; nor did Tunley & Co. return empty cans or cases to Frey & Horgan.

There is a shortage of cases, erroneously computed in the testimony and twice in the Findings as to the required number, and the testimony is lacking in clearness as to the precise shortage, but it seems to be not less than 4,000 cases. The permittee offers no explanation of this subject.

The fact has not been overlooked that government inspectors were in frequent attendance at the place of business of the permittee where he says he purveyed his "Perfume Supreme"; nor that one inspector says that,

on more than one occasion he saw lilac oil delivered from a taxicab, and some empty cans returned by truck. He might well have observed those incidents, without disproving the testimony as to a substantial shortage of lilac oil, cans, and cases.

With regard to the first charge, the plaintiff's attorney urges that the formula did not call for lilac oil, but just "oil." That is true. He argues that the inventory of December 10, 1928, refers to other oils as being in the plant, and hence the specific shortage of December 31, 1928, has not been shown. The permittee does not help his counsel in this matter, for he is unable to tell how much of the unidentified oil he had on hand on December 31, 1928. An inventory of September 25, 1928, showed 60 pounds of "Misc. oil," which would not meet the discrepancy of over 275 pounds. Besides, he says he used lilac oil in the manufacture of "Supreme."

Reference has not been made to a discrepancy between the delivery records of the permittee and the receipt records of the warehouse in December, 1928, of 100 cases or 1,000 gallons, which was the subject of a correction or amendment of the permittee's records, at a later time.

If there was concealment, instead of an error innocent in character, it would be consistent with the general character of the permittee's business and his methods.

■ While the findings are not as precise as they might be in the matter of shortage of lilac oil, and the computations are not set forth so clearly that review of the record is facilitated by examining either the testimony or the findings, sufficient has been shown to persuade this court that there is evidence to sustain the findings as to the first three charges, and that the revocation is neither arbitrary nor capricious. The fourth charge is in the nature of a conclusion which follows, if the other charges are true. There is no evidence to sustain it, apart from that which applies to the others, and it has been deemed as surplusage in the review here accorded.

Decree for defendants, with costs.