## PILOT LIFE INS. CO. v. WISE.
### No. 6650.

Circuit Court of Appeals, Fifth Circuit.

Oct. 26, 1932.

Grover Middlebrooks, of Atlanta, Ga., for appellant.

W. W. Dykes, of Americus, Ga., for appellee.

Before BRYAN, SIBLEY, and WALKER, Circuit Judges.

SIBLEY, Circuit Judge.

On September 13, 1929, Pilot Life Insurance Company issued a policy of insurance to Paul H. Jennings, with Dr. S. P. Wise, creditor, as beneficiary, thereby promising to pay $2,000 on due proof of the death of Jennings, and $2,000 additional if that death resulted within ninety days directly and independently of all other causes from a bodily injury inflicted through external, violent, and accidental means. The policy was stipulated to be void if the insured, whether sane or insane, should commit suicide within two years from its date, and the accidental death benefit was to be void in case of such suicide at any time. On the morning of March 11, 1931, Jennings was found dead on the end of a railroad trestle, his body lying back up upon the cross-ties outside of the rail, legs hanging over the ends of the cross-ties, shoulders close to the rail, head severed and lying inside of the rail between two cross-ties face down, the back of the head being knocked away and the brains scattered along the track. The right hand, from which some fingers had been mashed, was still resting against the rail, and the coat was torn across the shoulders, but the body was otherwise unbruised and unmutilated. No evidence of weapons, poison, or other cause of death than by a train was found. Dr. Wise sued on the policy, claiming $4,000. The insurance company defended, alleging suicide. The court overruled the defendant's motion for a directed verdict, and the jury found $4,000 for the plaintiff. Besides the facts above stated, it was proven that Jennings was at college preparing to study medicine, Dr. Wise advancing him money. Dr. Wise had written to say that he probably could not continue the advances. Jennings had become despondent, and had been drinking some, but not the day before his death. His roommate last saw him at 7 p. m., when Jennings started, as he said, to go to a veterinary hospital about a mile and a half distant and beyond the railroad trestle at which his body was found. In Jennings' pocket were two notes in his own handwriting, one to a young lady saying he would not fill a date with her on the 28th and bidding her goodbye; the other to his roommate asking him to get his books and clothes together and put them in his trunk, and saying they had been pals through life but must part. There was also a two-page letter to his mother, stating that he was blue and despondent, and disappointed at not being able to go to medical school; that he had brooded and prayed over it, and tried whisky, but it did not help; that he had talked to his God and his God told him to come, and he hoped to meet his mother there some day; he supposed Dr. Wise would get the insurance, and hoped it would burn his pauper pocket, but he hoped also there would be enough insurance money for his younger brother to complete his education. There was no evidence from any trainmen, and no proof of what train had killed Jennings; whether it was running backwards or forwards or fast or slowly; whether there were blood signs on the engine pilot or its wheels, or on the car wheels only. It will be remembered that, as to the main promise of the policy to pay $2,000, the initial burden was on the plaintiff to show death only; the defendant having the burden to show suicide. As to the accidental death benefit, the plaintiff had the further burden to show an accidental death; and a voluntary suicide would not be such. It is true that the presumption against suicide would aid the plaintiff on both branches of the case. But the presumption is based on the general unlikelihood that one would wish to die or would destroy his own life. The letters which Jennings had written can mean only that he had resolved to die. Such a resolution so expressed, coupled with his immediate death in a fashion at least as likely to have been voluntary as otherwise, is sufficient to neutralize the presumption and render most important every circumstance which might indicate whether he was when killed really executing his mortal intent, or whether an accident supervened. If the train which killed Jennings was headed by an engine having the ordinary pilot with its rim covering the rails and only a few inches above them, and with pilot beam and cylinders extending some two feet beyond the rail, it is difficult to see why he was not knocked from the track and his body bruised and broken, whether he was walking, sitting, or lying on the track. On the other hand, the trestle being only waist high at that point, he could voluntarily have placed his neck on the rail with head depressed, either in front of the engine or between the trucks of the coaches after the engine had passed, with the exact results which were found. But if the engine was moving slowly backwards, or had no pilot, one sitting on the end of the cross-ties might be pushed over

sidewise and might fall back up with neck and hand on the rail, and be thus decapitated. It appears in the record by hearsay that blood stains were seen on some wheels of some train the next morning. This information followed up might develop important facts. Since there must upon another ground be a new trial in which more light may be thrown on the exact manner of Jennings' death, we forbear to express an opinion upon the evidence as it now stands, or to rule upon the refusal to direct the verdict.

■ From what has been said, it is apparent that the theory of accidental death is strengthened by, if it is not wholly dependent upon, Jennings being intoxicated when struck by the train. It is hard to account otherwise for his presence on the trestle, since his proper route to the veterinary hospital led under it. A quart bottle was permitted in evidence which Jennings' roommate said belonged to them, and which on Monday night before the death had a half pint of whisky in it. He next saw it Wednesday at the coroner's inquest at Athens, about two miles from where the body was found. It was empty, and had then, as at the time of the trial, bloodstains on it. There was no showing as to how the bottle got to the inquest, nor whence it had come, nor specifically that it had been found at the scene of the death. Objection to the bottle on this ground was erroneously overruled. Any article made important by the evidence or by the nature of the investigation may be produced for the jury's inspection; but, in order that it may be so used as evidence, it must be satisfactorily identified, and it must also be shown that no such substantial change has taken place in the article exhibited as to render the evidence misleading. 22 C. J. "Evidence," § 872. This bottle was eloquent through the blood upon it. The jury probably reasoned that the blood showed the bottle to have been on Jennings' person or in his hand when he was killed, and that he had emptied it and was drunk. Yet, so far as the proof goes, the bottle may never have come from the scene of the killing at all.

■ The testimony of a witness for the insurance company was taken by deposition. On cross-examination he was asked: "What position did the evidence show that he (the insured) was found in?" The answer was: "It seemed as if he had evidently held himself on the track with his right hand, with his face down, and that he had never moved after the train hit him." The insurance company offered the question and answer in evidence, and they were ruled out on objection by the plaintiff, apparently before they were read to the jury. Except where public policy is thereby violated, Bishop v. Bishop, 124 Ga. 294, 52 S. E. 743, if on oral cross-examination one asks an irregular question which is directly answered, he cannot object to his own question when the answer is disappointing, Tift v. Jones, 77 Ga. 181, 3 S. E. 399. Where the evidence is taken out of the jury's presence the rule does not apply, if the question is withdrawn before the answer is read to the jury. Anderson v. Brown, 72 Ga. 714. But in any case, if the answer given is not responsive to the question asked, the answer may and should be ruled out for that reason. The present question inquired for the evidence given at the coroner's inquest and not for the conclusions of the witness from it. Both because the answer did not appear to have been read to the jury before the question was withdrawn, and because it was not responsive to the question, the answer was properly rejected.

No other assignments disclose error or require discussion.

Reversed and remanded for further proceedings.