## LOVE v. NEW YORK LIFE INS. CO.
### No. 6577.

Circuit Court of Appeals, Fifth Circuit.
May 5, 1933.

SIBLEY, J., dissenting.

Gerald Fitzgerald and W. W. Venable, both of Clarksdale, Miss., and Walter Sillers, of Rosedale, Miss., for appellant.

Ernest Kellner, Jr., of Greenville, Miss., for appellee.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

BRYAN, Circuit Judge.

The New York Life Insurance Company in 1926 issued a policy of insurance on the life of Robert C. Love, by which it agreed to pay $5,000 upon proof of death of the insured, and an additional $5,000, called "double indemnity," upon proof that death resulted from bodily injury effected through "external, violent and accidental means.' The insured died on May 23, 1931, of a gun shot wound. His widow, the beneficiary named in the policy, acknowledging payment of $5,000, the face of the policy, but alleging that the death of the insured was acci-

dental, brought this action to collect the double indemnity. The insurance company denied this allegation, and pleaded affirmatively that the insured committed suicide. At the close of the evidence the trial court directed a verdict for the defendant. The plaintiff appeals on the sole ground that it was error to take the case away from the jury.

At the time of his death Love was 48 years of age, happily married, with two children, one 6 and the other 8 years old. He was carrying all told $53,000 in life insurance, $22,000 of which had been in force for more than two years. The remaining $31,000 was less than a year old, the evidence being silent as to whether the policies were subject to the usual suicide clause. It does not appear what loans, if any, were outstanding against the policies. In addition to the life insurance Love had an estate estimated by his wife at $5,000, consisting mainly of a mortgage for $1,200, and shares of the stock of two corporations. His annual income aside from his salary did not exceed $1,000. He was buying a plantation which was rented for $3,500 a year, but after his death it was surrendered in satisfaction of the balance due on the purchase price. He had been employed for 15 years by the Delta Farms Company, and was then its bookkeeper and cashier at Deeson, Miss., at a salary of $250 per month. On the day before his death, Johnston, president of the Delta Company, had an interview with him and called for an explanation of his failure to charge himself on the books with $218, the irregularity having been discovered by auditors in the course of an audit which had not then been completed. His explanation that his account was somewhat "balled up," accompanied by an offer to make settlement, was not satisfactory to Johnston, who thereupon discharged him and told him that a man to take his place would be sent to Deeson on the following morning. According to Johnston's testimony Love asked to be continued in his position until fall, stating that he was financially embarrassed, had only $25 or $30 in cash, and if he were discharged at once and his salary discontinued it would be impossible for him to furnish supplies to the tenants on his plantation. This request was denied, but Johnston agreed to pay him an extra month's salary, in return for which he was to assist the auditors in completing the examination of his accounts. There was no threat of prosecution, but Love was told that he would be expected to make good any shortage disclosed upon completion of the audit. Love told his wife that night about his interview with Johnston. She testified that he did not tell her he had already been discharged, but said that it was possible Johnston would ask for his resignation, although he still believed he would be able to "straighten out everything"; and that he had arranged with the owner of the property on which he had a mortgage for a place to live if it should become necessary to move because of his loss of position. She further testified that he slept well that night as usual, was cheerful and appeared to be perfectly normal in every way the next morning when he left home for his office. On that morning, May 23d, Love reached his office about 8 o'clock. The day was Saturday. Within a few minutes Edwards, an overseer, called with his pay roll, and Love, after checking it over, told him to tell overseer Conger to come to the office with another pay roll. Conger came within 15 or 20 minutes, and when he arrived found Love's dead body in a vault connecting with the office. The vault was about 8 feet square and had a cement floor. As one entered it from the office there was a shelf on the left, and a wall safe in the opposite corner. The doors to the vault and to the safe were both open. Love was lying on his back, his feet toward the safe. An old-style pump gun, 50 inches in length, in the chamber of which was a freshly discharged shell, was lying diagonally across his body with butt to the left. In his left hand was a pencil and in his right hand a piece of window-screen molding, 27 inches long with three nails in it; about two-thirds of the molding being below the hand and extending toward the feet. There were powder burns above the left shoulder, and a gunshot wound on the left side of the head just behind the prominence of the cheek bone. The wound ranged upward and slightly inward. Shot had entered the ceiling above the body and in front of the safe. The ceiling was about 7 feet high and also showed signs of powder burns. The gun which was found lying across the body did not have a rebounding hammer, and, according to the testimony of the witnesses who experimented with it, would, if the hammer were let down, explode a shell when dropped butt down onto a cement floor from a height of 12 inches. Love was 5 feet and 9 inches tall. At some time not disclosed by the evidence a splinter, extending up from the toe of the stock about 3½ inches and ⅜ of an inch thick at the lower end, had been split off. That splinter was not found in the vault, although three witnesses made a careful examination. Plaintiff's brother, who examined the gun two days after Love's death, gave it as his opin-

ion that the piece of the stock had been freshly broken off, and testified that he made a search for it, but was told by Love's successor that the vault had been swept out and that everything swept out had been burned. Love did not own the gun, but held it as security for a small loan which he had advanced to a tenant; the length of time he had held it under pledge was not shown. The tenant was not called as a witness; nor was it otherwise shown whether the splinter had been split off before or after the gun was pledged as security. In the vault at the time of Love's death were also three pistols, one of which was loaded, a loaded rifle, and an automatic shot gun. The last named weapon was lying at Love's feet; the evidence fails to disclose whether it was loaded or not.

█ The burden was on the plaintiff to prove that the death of the insured resulted solely from external, violent, and accidental means. That the means of death were external and violent was conclusively shown by the character of the injury. The evidence is entirely circumstantial, but the circumstances all exclude any theory that death resulted from the act of another than the insured, and so it was either suicidal or accidental. Suicide will not be presumed from the mere fact of violent death, and the reasonable inference of accident therefore arose upon proof of death without any additional evidence. Missouri State Life Ins. Co. v. Roper (C. C. A.) 44 F. (2d) 847. But the presumption against suicide was overcome if the preponderance of the evidence was consistent with the theory of suicide and at the same time was inconsistent with any reasonable hypothesis of death by accident. New York Life Ins. Co. v. Bradshaw (C. C. A.) 2 F.(2d) 457; New York Life Ins. Co. v. Weaver (C. C. A.) 8 F.(2d) 680; Planters' Bank v. New York Life Ins. Co. (C. C. A.) 11 F.(2d) 602; Davis v. Reliance Life Ins. Co. (C. C. A.) 12 F.(2d) 248; Burkett v. New York Life Ins. Co. (C. C. A.) 56 F.(2d) 105. In Ætna Life Ins. Co. v. Tooley, 16 F.(2d) 243, we deliberately disapproved expressions of this court in Fidelity & Casualty Co. v. Love, 111 F. 773, and National Union v. Fitzpatrick, 133 F. 694, to the effect that in order to overcome the theory of accidental death suicide must be shown "beyond dispute" to be an "absolute certainty." Those expressions were taken from Pythias Knights v. Beck, 181 U. S. 49, 21 S. Ct. 532, 45 L. Ed. 741, in which, however, the holding was merely that the evidence was as consistent with accident as it was with suicide. We are still of opinion that the language this court used in the Love and Fitz-

patrick Cases is too broad and does not state the true rule of evidence applicable to a case like this. Home Benefit Association v. Sargent, 142 U. S. 691, 12 S. Ct. 332, 35 L. Ed. 1160, is not in point as the issue there was whether the deceased shot himself intentionally or accidentally while he was suffering from a severe headache. The Supreme Court was careful to point out that the bill of exceptions did not purport to contain all the evidence in the case.

█ Here the evidence is consistent with the view that Love was actuated by a motive to take his own life, although proof of such motive is not required. He had lost the position he had held for many years under circumstances which might make it more than ordinarily difficult to secure other employment; was in financial difficulties, unable to pay the premiums on a large amount of life insurance; doubtless felt he would be disgraced in the eyes of his friends and neighbors, and humiliated to have to turn over his position to his successor, in whose presence he was expected to assist auditors in ascertaining whether he had been dishonest. The circumstances are all consistent with the theory of suicide. They would have been just as they were proved to be if he had stood in front of the safe with the gun in his left hand, rested it on the floor, pointed the barrel toward his head, leaned slightly forward and pushed the trigger with the piece of molding which was found in his right hand. The muzzle of the gun would then have been within a foot of his cheek where the load of shot entered if he had been standing up straight; of course it would have been nearer if he had leaned forward. On the other hand the circumstances are all inconsistent with any but a fanciful theory of accident. In support of this latter theory it is argued that possibly Love might have picked up the gun with his left hand, lifted it vertically a foot or more from the floor, unintentionally let it slip back to the floor in such position as to split the splinter off the toe of the stock, and to point the muzzle at the exact angle and in the particular direction necessary to inflict the fatal wound. This argument explains too little and assumes too much; among its other faults it ignores entirely the tell-tale stick with the nails in it, and takes it for granted that the splinter was split off at the time of Love's death. There was no indication that Love was making preparations to leave the office and take the gun away with him. If he had occasion to move the gun, to lift it straight up a foot off the floor with the muzzle point-

ing toward him would seem to be a most unusual thing to do; especially since the gun as he picked it up was leaning against the wall with the muzzle pointing away from him. "Verdicts must rest on probabilities, not on bare possibilities." Samulski v. Menasha Paper Co., 147 Wis. 285, 133 N. W. 142, 145; United States v. Crume (C. C. A.) 54 F.(2d) 556. The theory of accident can only be supported by piling possibility upon possibility. The piece that had at some time or other been broken off the gun stock was not found in the vault. The assumption that it was broken off at the time of Love's death is based upon conjecture pure and simple. Without that assumption, the other possibilities vanish and the whole theory of death by accident is unsupported by any evidence whatever. The testimony that the place where the splinter had been split off was fresh two days after Love's death cannot possibly be construed to mean that the break occurred at the time of his death or at any particular time. There was not a shred of evidence to indicate that the stock was not in the same condition when Love took the gun in pledge. The splinter, if it had been found, would not have been admissible in evidence without some proof that it was found in or near the vault. Pilot Life Ins. Co. v. Wise (C. C. A.) 61 F.(2d) 481. As in our opinion the only reasonable or probable inference to be drawn from the evidence, construed most favorably for the plaintiff, is that the gun-shot wound which caused Love's death was intentionally self-inflicted, we conclude that the trial court did not err in directing a verdict for the defendant.

The judgment is affirmed.

SIBLEY, Circuit Judge (dissenting).

The rule announced by the majority that "the presumption against suicide was overcome if the preponderance of the evidence was consistent with the theory of suicide and at the same time was inconsistent with any reasonable hypothesis of death by accident" is a good one to give in charge to a jury but not a good one on which to exclude the jury from their constitutional function of weighing the evidence and the inferences from circumstances. The question here is whether the gun was discharged accidentally or intentionally, and the evidence is wholly circumstantial. There is, I think, no such certainty of suicide as to exclude the reasonable possibility of accident. The gun was evidently vertical when it fired, was resting on the floor at Love's left side, and the muzzle was opposite his shoulder, the load carrying away the left side of his skull. The wound was not through the roof of the mouth, nor directly into the temple or forehead, as an intentional one would likely be, but it began at the cheek bone and went almost straight up. The time and place do not suggest suicide. In early morning, after a good night's sleep, Love was at his work, had just transacted business with one overseer and had sent for another. The gun was not procured for the deed, but stood customarily in the vault with other weapons, some of them loaded and seemingly kept there for emergency use. The gun used was an old one without rebounding lock and to that extent dangerous, but the only one in which Love was shown to have had any personal interest, for it was pledged to him to secure a loan. He might very reasonably have taken it up to examine it or to set it aside. His general circumstances were not such as to make it probable that he would kill himself. He was not desperate, but hopeful. He had lost his job, but only because he had failed to post to his account $218 of goods purchased at the company's store, of which there was, as he knew, a full record in the duplicate tickets kept at the store. There could hardly have been crime in the failure, and certainly no prosecution was threatened. He had not yet even tried to get other work. He had a plantation not paid for but rented for $3,500 per year for three years to come. He owned a store rented for $30 per month, had cows whose milk and butter netted him $25 or $30 per month, had Plough Chemical Company stock which was paying $300 per year and had $1,500 in Investors' Syndicate and a $1,200 mortgage on a place which he told his wife he had arranged to occupy if they had to leave their home. Here was a cash income of more than $1,000 per year outside of the farm rents. In good health and domestically happy, he had no great cause for depression and had shown none. True his life was insured, and by killing himself he could give his family money on his older policies; but $31,000, the greater part of his insurance, was not a year old and would be nullified thereby. He could have eased his financial strain by dropping this new insurance with the loss of only one premium; or, if he was planning to enrich his family dishonestly, he could probably from his other means have carried it for another year and rendered it incontestable. There has been much discussion of the pencil found in Love's left hand, and the stick with the nails in it in his right hand, and the freshly splintered gunstock. The theory of suicide uses the

stick to push the gun trigger, but it makes no explanation of the pencil and the splintering except to say that the pencil may have been meaningless and the splintering unconnected with the death. The theory of accident replies that the stick with the nails in it may have been picked up from the floor lest it be stepped on; the gun may have been innocently raised by the muzzle with the left hand having the pencil also in it and, the pencil tending to make the grasp insecure, may have fallen vertically 12 inches or more to the floor when, if loaded, experiment proved that it would fire although not cocked, and could thus readily have made the wound that was made. A witness qualifying as expert on comparing the cap of the fatal shell with one fired with the gun at full cock gave it as his opinion that the former had not been fired at full cock. The gun stock is so shaped that in dropping vertically the toe strikes first. The splinter that was knocked off from the toe was evidently knocked off at some time in that way. The testimony is uncontradicted that the break showed bright and fresh. No one thought to look for the splinter until Monday morning, after the death on Saturday. It was not found because the vault had meanwhile been cleaned out and the sweepings burned. No other occasion for the stock to get freshly broken is shown, and it is not irrational to conclude that it had been dropped vertically by Love, the only man shown to have recently had his hands on it.

The burden of explaining away circumstances which indicate accident was on the insurance company. Upon proof of a death by external violence without more, accident and not suicide will be presumed. Travelers' Insurance Co. v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308; Preferred Accident Ins. Co. v. Fielding, 35 Colo. 19, 83 P. 1013, 9 Ann. Cas. 916; Meadows v. Pac. Mut. Life Ins. Co., 129 Mo. 76, 31 S. W. 578, 50 Am. St. Rep. 427, and the host of cases cited in the notes to each. The preference for accident rather than suicide as the explanation for a violent death which might be due to either is not an artificial rule of law made to prescribe an order of proof as some presumptions are, disappearing so soon as the proof is in. It is an inference of truth drawn from the common knowledge that men ordinarily do not destroy but strive by all means to preserve their own lives. It is part of the probability of the situation, and continues while opposing evidence is weighed and may be weighed against it, but yields to reasonable proof whether positive or circumstantial to the contrary. In Bohaker v. Travelers'

Ins. Co., 215 Mass. 32, 102 N. E. 342, 344, 46 L. R. A. (N. S.) 543, Chief Justice Rugg says: "It [suicide] cannot be assumed without clear proof. The presumption is that one does not commit suicide. Such a presumption, being one of fact, stands until overthrown by evidence." The original improbability of suicide is rebutted by proof that it did happen. Davis v. Reliance Life Ins. Co. (C. C. A.) 12 F.(2d) 248. In Pilot Life Ins. Co. v. Wise, 61 F.(2d) 481, we held that a letter clearly expressing a present intention of suicide followed immediately by death in a fashion likely to have been voluntary might rebut it. In Burkett v. New York Life Ins. Co., 56 F.(2d) 105, and in New York Life Ins. Co. v. Bradshaw, 2 F.(2d) 457, we held that a circumstance established by uncontroverted evidence inconsistent with accident would prevent a finding of accident. Of course, if all the circumstances indicate suicide, and support no reasonable theory of accident, a verdict of suicide is demanded. Ætna Life Ins. Co. v. Tooley (C. C. A.) 16 F.(2d) 243. In every case the question at last is, remembering the general improbability of suicide, what is the real truth under all the facts proved?

In this case the evidence being wholly circumstantial, and the inferences from it not conclusive, I think the case was one for the jury. In Home Benefit Association v. Sargent, 142 U. S. 691, the circumstances detailed on page 698, 12 S. Ct. 332, 35 L. Ed. 1160, were stronger to show suicide than those here, but they were held to make a jury case on a possible theory of mental disease. So in Pythias Knights v. Beck, 181 U. S. 49, 21 S. Ct. 532, 45 L. Ed. 741, the circumstances were thought too inconclusive to authorize a directed verdict of suicide, though deceased's wife had quit him, and he had rented the gun, was drinking and a policeman was seeking to arrest him. The court said, pages 53 and 54 of 181 U. S., 21 S. Ct. 532, 533: "Whether the deceased committed suicide was a question of fact, and a jury is the proper trier of such questions. * * * The hack driver heard him go into the closet, and after a minute or so heard him step outside and immediately the gun was discharged, and on examination he was found with the upper part of his head shot off. It was so dark that no one saw the circumstances of the shooting. Whether it was accidental or intentional is a matter of surmise. * * * Under those circumstances it is impossible to say that beyond dispute he committed suicide. The discharge of the gun may as well have happened from the careless conduct of a drunken man as from an

intentional act." A theory that a man found dead beneath the window of his office had sat down in it to get some air, or had fainted and fallen out, was thought reasonable enough to go to the jury along with the presumption against suicide, though he had been greatly worried and sleepless and fell with arms extended as if diving. U. S. F. & G. Co. v. Blum (C. C. A.) 270 F. 946. Our case of National Union v. Fitzpatrick, 133 F. 694, was a stronger case for suicide than this, but was held for the jury. See, also, Fidelity & Casualty Co. v. Love (C. C. A.) 111 F. 773, and Standard Life Ins. Co. v. Thornton (C. C. A.) 100 F. 582, 49 L. R. A. 116. It was error to direct a verdict of suicide.