# NEW YORK LIFE INS. CO. v. TRIMBLE.

## No. 7132.

Circuit Court of Appeals, Fifth Circuit.
April 6, 1934.

As Corrected April 13, 1934.

Rehearing Denied May 2, 1934.

F. G. Thatcher, Elmo P. Lee, and Tinsley Gilmer, all of Shreveport, La., for appellant.

Otis W. Bullock and Howard B. Warren, both of Shreveport, La., for appellee.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

BRYAN, Circuit Judge.

The New York Life Insurance Company in 1926 issued a policy of insurance upon the life of Guy H. Trimble by which it agreed to pay $10,000 upon proof of death of the insured, and an additional $10,000, called "double indemnity", upon proof that death resulted from bodily injury effected solely through "external, violent and accidental cause." The insured died on Monday, October 13, 1930, of a pistol wound. His mother, the beneficiary named in the policy, acknowledging payment of $10,000, the face of the policy, but alleging that the death of the insured was caused by the accidental discharge of a pistol, brought this action to collect the double indemnity. The insurance company denied this allegation and pleaded affirmatively that the insured committed suicide. The trial resulted in a verdict and judgment for the plaintiff. The defendant appeals and assigns as error the refusal of the trial court at the close of the evidence to direct a verdict in its favor.

At the time of his death the insured was employed as junior engineer by the Arkansas Natural Gas Corporation. About the 1st of September, 1930, he was sent to Tullos, La., a village or small town about 100 miles from Shreveport where his mother lived. While at Tullos he slept in an upstairs room of his employer's warehouse. About 7 o'clock on the morning of October 14, 1930, his body was discovered in his bedroom by one of his employer's lease foremen. The body, fully clad in working clothes, was lying face up crosswise the bed, the feet resting on the floor toward the north. There was a west window at the head of the bed, the upright facing of

which was about in line with the north side of the bed. The insured had been shot through the head with a .32 caliber bullet. The wound was straight through the temples from right to left, a little above and in front of the ears. There were powder burns in and immediately around the wound where the bullet entered, indicating that the weapon was held against the right temple. There was also an indentation in the upright facing of the window in line with the flight a bullet would naturally take if fired horizontally through the head of one sitting on the north side of the bed. The bullet which caused the insured's death was picked up off the floor near the window, and the empty shell out of which it came was found on the floor near the foot of the bed. The insured was right-handed, and in the right hand was a German-Leuger automatic pistol. The forefinger was not resting on the trigger, but all four fingers of the right hand were clasped around the handle. The clip or magazine of the pistol lay on the bed about 18 inches away from the right side of and between the body and the foot of the bed. It was made to hold eight loaded cartridges, and contained seven, identical in size and kind with the death missile. The pistol was usually loaded from the magazine by raising and then lowering the mechanism on the top of it. After the first cartridge had been thrown into the barrel, it could be fired continuously by pressure upon the trigger after each shot until all the cartridges in the magazine were exhausted. It could be loaded, however, by hand if the magazine were removed. One loading it either way could easily see whether the barrel was empty or not. The clip could be removed by pressing against a spring on the left of the handle near the trigger and pulling it out from the bottom. Perhaps the magazine when loaded would drop out merely upon pressing the spring. But that spring was so located that one firing the pistol in the usual way could not touch it with his forefinger. One could not take a firm grip on the handle and at the same time extend his forefinger through the trigger guard far enough to release the spring; only by somewhat releasing the grip on the handle could the forefinger reach through the trigger guard past the trigger far enough to touch the spring and release the clip. The pistol also had a safety device in plain view, which, if properly set, kept the pistol from going off although the trigger was pulled. On October 13 the insured remained at the office in the warehouse after his co-workers had left for the day.

He was last seen by them about 6 o'clock p. m., and so far as is known did not go to supper. He mailed in to the company that day his semimonthly statement of his salary which was not due to be sent in until the 15th. Long, with whom the insured sometimes went to supper, returned to his room across the hall about 8:30 and went to bed. He heard no pistol shot or unusual noise that night. A physician, who made a post mortem examination some time during the morning of the 14th, testified that in his opinion the insured had then been dead fourteen or fifteen hours. There was no evidence or circumstance to indicate that the insured had been engaged in a struggle or that any of his personal effects had been interfered with or taken. Indeed, it was not the theory of the plaintiff that there had been an intentional killing; for, as already stated, she alleged that death was caused by the accidental discharge of the pistol. On the question of motive for suicide, evidence for the defendant disclosed that the insured was anxious to be transferred to Shreveport where he could be with his mother and his friends, and was disappointed at being kept so long at Tullos. The inference sought to be drawn is that he killed himself during a spell of despondency. As against this, the evidence for plaintiff was that the insured's habits were good; that he was of a happy, cheerful disposition, was well educated, studious, ambitious, and was confidently looking forward to a successful career in the business world.

That the cause of death was external and violent was conclusively shown by the character of the injury. The evidence is entirely circumstantial, but the circumstances all exclude any theory that death resulted from the act of another than the insured; and so the conclusion must be that the insured himself fired the fatal shot. Whether he fired the pistol intentionally and so committed suicide, or unintentionally and therefore accidentally, is the only question in the case. Suicide will not be presumed from the mere fact of violent death, and the reasonable inference of accident therefore arose upon proof of death without any additional evidence. But the presumption against suicide was overcome if the preponderance of the evidence was consistent with the theory of suicide and at the same time was inconsistent with any reasonable hypothesis of death by accident. "Verdicts must rest on probabilities, not on bare possibilities." Love v. New York Life Ins. Co. (C. C. A.) 64

F.(2d) 829, 832, and cases there cited. In a case where the insured holds a pistol against his temple and shoots himself with it, the plaintiff who relies on the theory of accident in a suit on the policy is indeed under a heavy burden. New York Life Ins. Co. v. Bradshaw (C. C. A.) 2 F.(2d) 457; Planters' Bank v. New York Life Ins. Co. (C. C. A.) 11 F.(2d) 602; Davis v. Reliance Life Ins. Co. (C. C. A.) 12 F.(2d)) 248; Ætna Life Ins. Co. v. Tooley (C. C. A.) 16 F.(2d) 243. A motive for suicide is helpful to the defense but is not essential. Ætna Life Ins. Co. v. Tooley, supra; Burkett v. New York Life Ins. Co. (C. C. A.) 56 F.(2d) 105. This is so because in this life men who have no apparent motive for it do commit suicide. Perhaps always in the case of a sane person who commits suicide there is a motive; but in many cases the motive is not and possibly could not be proven. And so here we leave out of consideration any question of motive for suicide, and assume there was none. In our opinion the circumstances in this case are all consistent with the theory of suicide, and are all inconsistent with any but a fanciful theory of accident. There are several which indicate that the insured planned to take his own life. He prepared and sent in ahead of time a statement of the salary that would be due him for the unexpired first half of the month. He remained alone in the office, and, according to the post mortem examination, killed himself after his companions left him and while they were probably away at supper. He took the clip out of the pistol and laid it on the bed beside him, evidently either for the purpose of taking no chances on shooting himself more than once, or of creating an impression that his death was accidental. But laying aside all questions of preparation also, we think suicide was shown beyond any reasonable doubt. The facts that the wound was self-inflicted and that the insured intentionally pulled the trigger while holding the pistol against or very close to his right temple are not disputed, nor can they reasonably be controverted. In support of the theory of accident, the argument is advanced that the insured might have thought the pistol was not loaded, and so thinking in a spirit of bravado turned it upon himself and pulled the trigger, and that the forefinger at the time it was pressed against the trigger touched also the spring, thereby releasing the loaded magazine. It must be borne in mind that the insured was alone in his room. However it might be if others had been present, it is inconceivable that he would show off to himself in such a foolhardy manner. If it were possible for him to fire the pistol and at the same time press his forefinger against the spring, he did not do that on this occasion. The fact that his forefinger was found clasped around the handle which was held firmly in his hand, clearly shows that the handle was held and the forefinger applied to the trigger in the usual way. There is nothing to indicate that the forefinger touched the spring. What object could the insured have had to attempt to release the magazine at the time he pulled the trigger? The only reasonable theory on this branch of the case is that he removed the clip before firing the pistol. It seems that it would be more natural to throw a cartridge in the barrel from the magazine than to put it in by hand. However that may be, there was a cartridge in the barrel, and its presence there could have been ascertained almost instantly by slightly lifting up the mechanism which controlled the extractor hook and looking to see. It is beyond all reason to suppose that a sane man with no thought of killing himself would, under such circumstances as are here disclosed, place a pistol against his head and pull the trigger without first taking the precaution to ascertain that the pistol was not loaded.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

HUTCHESON, Circuit Judge (concurring).

I concur in the result and in all that is said in the opinion except the discussion on page 4 of the presumption against suicide. I think this has no place in this case, for the evidence, taken as a whole, does not raise any presumption. It does not maintain, it defeats her cause.

In suits on life policies containing exceptions for suicide, not only is the burden on the insurer to prove the exception, but the burden is made heavier by the presumption against self-destruction. In such suits plaintiff need prove no more than that death has occurred. In suits on accident policies insuring against the risk of death from external, violent, and accidental causes mere proof of death will not suffice. Plaintiff must prove, too, that the death was accidental. The true rule, I think, is that, where plaintiff's proof shows a violent death and does not show it to have been self-inflicted, his case is prima facie made out, because suicide will not be presumed. When, however,

plaintiff's case, as here, conclusively shows death by violence self-inflicted, plaintiff has not discharged her burden unless her proof goes further to show that the circumstances of the self-infliction are at least consistent with the theory of accident. Plaintiff fails here, not because the proof has overcome the presumption against her son's suicide, but because the proof fails to raise any presumption in her favor.