## NEW YORK LIFE INS. CO. v. SPARKMAN.

### No. 8940.

Circuit Court of Appeals, Fifth Circuit.

Feb. 9, 1939.

L. S. Julian, of Miami, Fla., for appellant.

John G. Simms and J. H. Mercer, both of Miami, Fla., for appellee.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

Suing upon the double indemnity provision of a life insurance policy, plaintiff claimed that the death of the insured had resulted directly and independently of all other causes, from bodily injury effected solely through external, violent and accidental means. The defendant denied this.

There were no eye witnesses to the shooting, but the evidence, which was entirely circumstantial, established beyond question that the sole cause of the insured's death was a self-inflicted pistol shot wound.

At the conclusion of the evidence, though both plaintiff and defendant moved for an instructed verdict, the case was sent to the jury upon the question whether the evidence made out a case of accidental death within the policy terms. From the verdict and judgment for plaintiff defendant appeals.

No exceptions were taken to the rulings on evidence, and none to the charge, except to the refusal to instruct a verdict for defendant. Only two errors are assigned on this appeal; one is to the refusal to direct a verdict on defendant's motion made at the close of the case; the other is to the remarks the court made at the close of the case, in the presence of the jury, and before the charge, in response to defendant's request that the jury be excused while the plaintiff and defendant were making their respective motions. "I do not see any reason for that; the jury are practical, commonsense men; why send them out? If there is anything you are ashamed of, they might as well know that too. Go ahead with your motions."

Thus the sole questions for decision on this appeal are (1) does the verdict of accidental death find support in the evidence? (2) in view of the circumstantial character of the evidence and the closeness of the question whether it made out a case of accidental death, was the duly ex-

cepted to comment of the court prejudicial error?

Except as to the claim of appellant that in determining whether a jury case is made out, this court is bound by the action of the Florida Supreme Court in similar cases, appellant and appellee are not in disagreement as to the controlling rule of law, as it has been repeatedly laid down in the decisions of this court.[1]

■ We do not agree with appellee that if there is a different rule in Florida for determining whether the evidence is sufficient to take a case to the jury than that obtaining in the Federal courts the Federal courts would be bound by it, for the question of whether the evidence makes an issue for a jury is one to be determined by the Federal courts by their own processes of reasoning and conclusion, and not according to any rule or standard which may be fixed for doing it by statutes or decisions of a state. Herron v. Southern Pacific Company, 283 U.S. 91, 51 S.Ct. 383, 75 L. Ed. 857.

■ But we find no substantial difference between the Federal and state authorities in the statement and application of the rule that where the proof shows a violent death not self-inflicted and no more, there should be a finding of accidental death, but that where, as here, it shows death by violence self-inflicted, it must go further to show that the circumstances of the self-infliction, are, if not inconsistent with the theory of suicide, at least consistent with that of accident.

Appellant insists that plaintiff did not sustain this burden; appellee that she did.

No one saw the shot fired. The nearest to eye witness testimony the record affords is that of a policeman who heard the shot and saw the body fall. He testified that at about ten minutes to 5 o'clock, while standing on the sidewalk in front of the City Hall, about 175 feet from the entrance door of the Horne apartments where the insured lived, he heard footsteps coming north on the avenue towards him; that he could not see the object as it was approaching until it got to the south end of the Horne Building in the light of a neon sign there; that he could then dis-

[1] Love v. New York Life Ins. Co., 5 Cir., 64 F.2d 829; New York Life Ins. Co. v. Trimble, 5 Cir., 69 F.2d 849, 851; Travelers' Insurance Co. v. Wilkes, 5 Cir., 76 F.2d 701, 704, 705; Fidelity & Casualty Co. of New York v. Driver, 5 Cir., 79 F.2d 713; Boggan v. Provident Life & Accident Ins. Co., 5 Cir., 79 F.2d 721, 723.

tinguish the object, and recognize movements, but could not distinguish features. "As the object came toward me it was in a sort of hurried, determined walk. As it got within about five feet of the center of the entrance door of the building going up into the apartments, the object stopped. I knew at that time it was a person. The first impression was that it was a negro woman. It stopped and it seemed as though they were pulling at their dress, or jacket, or whatever it was. My thought was that they were trying to make themselves permissible. By 'their dress or jacket' I meant her or his bathrobe. Then as they stopped, I looked at the clock, and noticed it was ten minutes to five. As I was looking at the clock I heard a shot, and as I looked I saw this object falling back and rushed to it, and when I got there I recognized the insured, and hollered twice and rattled on the screen door to attract attention. He was standing 4 feet from the wall, and when he fell his head was about 18 inches from the wall. His right foot was exactly 5 feet from the center of the screen door."

There was evidence as to the course taken by the bullet, the nature and appearance of the wound, and as to powder burns and marks on garments and body, and the general condition of insured's body and clothes. There was, too, the evidence of the insured's wife and others as to their satisfactory, indeed, happy, family relations and conditions, and of his wife and the companions with whom he had spent the greater part of the night before his death, as to happenings preceding it.

The bullet that caused his death entered his body on the left side of his chest, near the region of his heart, about an inch or an inch and a half from the center or median line of his chest, and emerged from his back practically opposite the place where it entered. It went straight through perpendicularly to the body, deviating very little, if any, upward or downward, or to the right or the left, and penetrating the left edge of the heart. There was no bullet hole through the front of his bathrobe, but there was one through the back of it, and through the back and front of his undershirt. After he fell the bathrobe lapped together over the wound, and there were powder marks on his chest and on his undershirt. There was some conflict as to the size of these, but a general agreement that the pistol must have been, when fired, within 5 to 7 inches of his chest.

The pistol was equipped with a safety device, which, upon the undisputed testimony, would prevent the pistol being fired as long as it was on. If the safety was in place the pin could not move, and it was a physical impossibility to fire the pistol. While it was possible for the safety to be pushed aside by rubbing against it, it was not probable that it could be. As the pistol is held in the hand it would be practically impossible for anything to hit the pistol on the side of the safety so as to strike it with force enough to put it off. There was, too, testimony that while many persons are careless and do not keep the safety on, and if the safety was off it could be accidentally discharged by unintentional pressure on the trigger, it is unusual to carry a pistol with the safety device off; it is customary to take it off only when the gun is about to be fired. There was no testimony that the insured ever carried the gun with the safety device off; none, as to how or when it was taken off at this time.

For some time before his death the insured and his wife had been occupying an apartment in the building in front of which he was shot. The deceased was in the trucking business with his stepfather, and was well satisfied with the business and with his place in it. When appellee last saw the insured, in the evening before his death, he had told her he was going to take a truck load to a boat at the docks in Miami, but instead of doing this, he had gone, with two friends, to a beer stand and gambling place called the "White Swan," about a mile and a quarter from Homestead where they lived. There they played rummy for small stakes and drank beer and rum until about quarter to four in the morning, when the operator of the place drove the insured home, arriving there about 4 o'clock, and the insured went to the apartment where appellee, according to her testimony, was awake, having been awake for about two hours.

Her testimony in substance is that she and the insured had known each other from childhood, and had been happily married for two years. That he was twenty-three and she twenty-six years old; that she was then pregnant, and had been for some months, and that she and the insured were looking forward with pleasure to, and making plans for, the birth of their

baby; that they had had no quarrel with each other that night, or at any time; that the insured was in good health and spirits, that she and the insured were well contented with their business and social position, and were happy in it, and that when he returned that night he was not drunk; in fact, had drunk very little.

As to the events transpiring upon insured's return from the White Swan, and before the shot was fired, appellee testified:

"I last saw him alive around four in the morning of April 2, 1937, in our bedroom. We had been in bed about fifteen minutes. We had said good night and he asked me why I could not go to sleep. I kept turning, and I told him it was because I was so nervous. He said 'I am here now,' and I said 'I have all this money in the house and the gun is not here.' [The money was money she had made in a beauty parlor conducted by herself.] And he said, 'Well I am sorry,' and just in a second he got up and put on his bath robe. He said nothing, and I was not in the habit of asking him where he was going. The bath room was down the hall. I heard him going down the stairs but I thought he was going toward the bathroom. I went to the window, and watched him go across the street, and when I saw him headed there I knew he was going for the gun so that it would settle my nerves after I had told him what I had. I thought nothing of it when I saw him open the car door and saw him take the gun out, and when he got to the bank building he was twirling it around his finger. He crossed the street and I could not see him any more, and I remember catching at the corner of my dresser. I was starting back to bed when I heard the shot and I went upstairs and called Mrs. Horne, and told her· I needed help, that something had happened to my husband.

"When he got back that morning he undressed and got in bed. He and I had no argument at that time. I did not notice anything unusual about him. He was not intoxicated, and did not appear to have indulged in liquor or beer to any extent."

The wife's testimony as to their happy married relations, and particularly that he had done very little drinking on the night of his death, was confirmed by others, and there was no evidence to the contrary.

Appellee argues that in the face of all these undisputed facts showing a complete absence of motive, any other finding than that the death was accidental would have been unreasonable. That the circumstances in evidence do not even point in the direction of suicide, much less overcome the presumption against it.

Appellant, on its part, argues that though there is no showing of any motive for suicide, neither is the showing made consistent with any but a wholly fanciful theory of accidental death.

Relying upon what we said in New York Life Insurance Company v. Trimble, 5 Cir., 69 F.2d 849, citing Aetna Life Ins. Co. v. Tooley, 5 Cir., 16 F.2d 243; Burkett v. New York Life Ins. Co., 5 Cir., 56 F.2d 105: "A motive for suicide is helpful to the defense but is not essential. * * * This is so because in this life men who have no apparent motive for it do commit suicide. Perhaps always in the case of a sane person who commits suicide there is a motive but in many cases the motive is not and possibly could not be proven. And so here we leave out of consideration any question of motive for suicide, and assume there was none. In our opinion the circumstances in this case are all consistent with the theory of suicide, and are all inconsistent with any but a fanciful theory of accident" [page 851], it insists that the circumstances, including the nearly eye witness testimony to the shooting, of the officer on the beat, makes out a case even more inconsistent than Trimble's case was, with any but a fanciful theory of accident.

Invoking Love's case, Love v. New York Life Ins. Co., 5 Cir., 64 F.2d 829, it declares that here, as there, the verdict has no firm ground but only the barest possibilities, to rest upon. Of appellee's theory that the apartment door sometimes stuck, and persons coming in were in the habit of kicking the lower panel, and shoving against the upper panel, and that this might have occurred at this time, causing the pistol to go off, appellant says that here is only a fanciful theory, with no fact whatever to sustain it, because there is no proof that the insured kicked or struck the door, but the contrary appears from the testimony of the officer. Appellee, on her part, meets appellant's theory that the fact that there was no hole in the front of the bathrobe, and that the shot had gone straight through the edge of the heart in a straight line from front to back, shows not an accidental, but an intentional dis-

charge, with the pistol held firmly in a shooting position inside the bathrobe, with the counter. theory that the insured no doubt saw the policeman and was hiding the gun inside his bathrobe, to avoid being seen carrying a pistol.

Appellant vigorously argues that the circumstances of the time of night, when the deceased came home, having left his wife sick, to play cards and drink all of the night, show a state of facts very different from those his wife testified to, and that his deception in telling her he was going to haul a load, when he was going out for a night of drinking and gambling, completely overthrows her testimony that all was well between them. It insists, too, that the facts testified to by appellee and all of her witnesses, that deceased came home about 4 o'clock, and it was ten minutes to 5 when he was shot, and that upon hearing the shot appellee knew her husband had been killed, make it plain that after a long and bitter quarrel because of his deception and delinquency, the insured had made up his mind to put an end to it all.

This argument appellee answers by pointing to appellee's testimony that the insured told her when he came back, that he had expected a load, but that the party had changed his mind; and to the testimony, including that of appellee, which positively and affirmatively shows that there was no quarrel that night and only the best of relations between the insured and appellee.

Finally, appellant urges upon us that, if in any view it could be regarded that there was sufficient evidence in support of appellee's theory of accident to take the case to the jury, the evidence as a whole was so closely balanced, and so little, if any, preponderating in favor of that theory, that it was greatly prejudicial to appellant for the court to say, in the presence of the jury, when defendant, a corporation, was moving 'for a verdict against appellee, a bereaved young mother and widow, "If there is anything you are ashamed of, why, the jury might as well know that too," and the cause should therefore at least be reversed for a new trial, free from its prejudicial effect.

On this last point we are in agreement with appellant. We think it quite clear that the question whether or not the appellee had sustained her burden of producing evidence of accidental death suffi-cient to take her case to the jury, is a close and difficult one. We think it equally clear that with the issue drawn thus tightly between the young widow of the insured and mother of his child, and the defendant insurance company, upon whether insured had met an accidental death, or, deserting wife and expected child, had shot himself to death, it was greatly important that nothing should be said or done by the judge which might reasonably be construed as reflecting on defendant for. contending that he had done so.

It could hardly be contended, if the judge had, with serious purpose and intent, said "If there is anything you are ashamed of, they might as well know that too," that the remark, under the circumstances, would not have been seriously prejudicial.

Nothing in the record, except the judge's statement in overruling the motion for a new trial, that "the remark was jovially made in a manner which was obvious to the jury and everybody in the courtroom, and could not have prejudiced the jury," points to anything but a seriously intended statement.

The record shows that the defendant duly excepted to the remark, that no withdrawal or correction of it was made by either the court or the counsel for appellee, and that it was only in the overruling of the motion for a new trial, based in part on the remark, that any explanation of the remark or qualification of its apparently serious import, was attempted.

In the state of this record, with the balance of the burden of proof wavering slightly, if at all, in plaintiff's favor, the remarks complained of, thrown in at a critical point on plaintiff's side, might well have tipped the scale with the jury, in her favor.

Averse as we are, indeed, unwilling, to reverse on points of practice and procedure in the conduct of a case, except where they have prevented, or tended to prevent, a fair and impartial trial, we cannot, upon this record, let this verdict and judgment stand.

Without undertaking, therefore, because on another trial the evidence may be different, to determine the question mainly argued here, whether it was error not to direct a verdict on defendant's motion, and without prejudice to its determination on another trial, if the evidence should be the same, the judgment is, be-

cause of the complained of comment, reversed and the cause remanded for further and not inconsistent proceedings.

Reversed and remanded.